UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH MARK HARRIS-BATTEN

        Plaintiff,

        *- against -*

COMMISSIONER OF SOCIAL SECURITY

        Defendant.

05 Civ. 7188 (KMK)(LMS)

REPORT AND
RECOMMENDATION

TO:   THE HONORABLE KENNETH M. KARAS
      UNITED STATES DISTRICT JUDGE

      Joseph Mark Harris-Batten ("Plaintiff"), proceeding *pro se*, brought this action against the

Commissioner of Social Security ("Defendant") seeking review of Defendant's decision to deny

Plaintiff disability benefits.  On June 21, 2007, Defendant moved this Court pursuant to Rule

12(c) of the Federal Rules of Civil Procedure for a judgment on the pleadings.  Docket #'s 11-12.

On August 5, 2008, the undersigned issued a Report and Recommendation, recommending that

Plaintiff's action should be dismissed without prejudice for failure to prosecute.  Docket # 15.

On August 13, 2009, Your Honor issued an Order finding that because Plaintiff had objected to

the Report and Recommendation in a timely fashion, he had adequately demonstrated his desire

to prosecute the case, and accordingly, the case should not be dismissed but should be referred

back to the undersigned for consideration on the merits.  Docket # 16.  Following a court

conference conducted on October 8, 2009, Defendant filed reply papers in further support of his

motion for judgment on the pleadings.  Docket # 19.  For the reasons that follow, I conclude, and

respectfully recommend that Your Honor should conclude, that Defendant's motion should be

granted, and the action should be dismissed.

I.    **BACKGROUND**

   A.    **Procedural History**

On May 16, 2002, Plaintiff filed his application for supplemental security income ("SSI"), claiming that his disability began on January 1, 1993.  Administrative Record ("AR") 35-37; but see id. 58 (alleged onset date was January 1, 1990).  His claimed disability included injuries to his right leg, right collar bone, right hand, and lower back, as well as blood in his stool related to colon cancer.  Id. 49.  Plaintiff's application was denied on September 20, 2002, id. 21-25, and he thereafter requested a hearing by an Administrative Law Judge ("ALJ").  Id. 26-27.  Following the September 22, 2003, hearing, the ALJ issued a decision, on January 20, 2004, finding that Plaintiff was not disabled within the meaning of the Act and was not entitled to SSI.  Id. 13-20. Plaintiff filed a request for review of the ALJ's decision with the Appeals Council.  Id. 9, 151. On March 18, 2004, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner.  Id. 6-8.  On August 15, 2005, Plaintiff filed his Complaint (Docket # 1), alleging that the ALJ wrongly denied him SSI.  After filing an Answer (Docket # 6), Defendant filed a motion for judgment on the pleadings on the grounds that the ALJ applied the correct legal standards and her decision was supported by substantial evidence.  Docket #'s 11-12.  Plaintiff opposes the motion, claiming that he still suffers from a disability.  Docket # 20 (Objection to Report and Recommendation).

   B.    **Medical Evidence**

      1.    **Records from Treating Sources**

On April 14, 2002, Plaintiff was seen in the ambulatory care clinic at St. Luke's-Roosevelt Hospital Center ("St. Luke's-Roosevelt").  AR 95.  At that time, the doctor noted

Plaintiff's history of a nonunion right clavicle and a right hand laceration, rendering him unable to use his right hand, along with moderate pain in his right arm and back.  Id.  The doctor also noted that Plaintiff reported pain in his right leg and difficulty walking.  Id.  Plaintiff reported that for the past year he had had blood in his stool.  Id.  The doctor examined Plaintiff and found tenderness in the right clavicle due to the nonunion and tenderness in the right thigh.  Id.  A rectal exam showed no anal tags or fissures.  Id.  Plaintiff was referred for additional testing with regard to the rectal bleeding, as well as for an orthopedic appointment, and he was prescribed Celebrex for pain.  Id. 94-95.

On May 9, 2002, Plaintiff went to the surgical clinic at St. Luke's-Roosevelt to follow up on his complaints of rectal bleeding.  Id. 93.  While the doctor found rectal skin tags, there were no masses or hemorrhoids.  Id.  The doctor ordered a colonoscopy.  Id.  A note from a Dr. Muhammad Faisal at St. Luke's-Roosevelt, that appears to have been prepared on May 10, 2002, states that Plaintiff had stool in his blood and was being evaluated for bleeding and that he had chronic pain from nonunion of his clavicle and a stab wound to the leg.  Id. 87.  On May 13, 2002, Plaintiff once again went to the ambulatory care clinic at St. Luke's-Roosevelt, and it was noted that he had a history of rectal bleeding and was scheduled for a colonoscopy.  Id. 92 (a duplicate of this report is at 91).  On May 30, 2002, Plaintiff went to the gastrointestinal clinic at St. Luke's-Roosevelt and reported rectal bleeding.  Id. 90.  A sigmoidoscopy was scheduled for June 24, 2002, and Plaintiff was to return to the clinic in four weeks.  Id.

On June 3, 2002, Plaintiff went to the ambulatory care clinic at St. Luke's-Roosevelt, looking for a disability form in his chart.  Id. 89.  He refused to answer as to whether he had rectal bleeding stating, "It is a waste of time man! [L]et people upstairs to deal with the

3

bleeding!"  Id.  Plaintiff said that the proper form was not in his chart.  Id.  The medical record from that date states that a disability form was filled out by Dr. Toosy.  Id.

On June 3, 2002, Dr. Kaiser Toosy filled out a Medical Request for Home Care form on Plaintiff's behalf.  Id. 97-99.  Dr. Toosy indicated that Plaintiff's primary diagnosis was a gastrointestinal bleed in his colon, with recovery anticipated in 6 months, and his secondary diagnoses were a right knee injury, a broken right collar bone, and a right hand injury, all of which were chronic conditions.  Id. 97.  The form notes that Plaintiff suffered from partial muscular/motor impairment of his dominant hand/arm and total muscular/motor impairment of his upper extremities.  Id. 98.  Dr. Toosy also reported that Plaintiff suffered occasionally from depression and always from sleep disorder, explaining that the sleep disorder was due to the broken right collar bone and that Plaintiff had stress and depression because of his injuries.  Id. The form indicated that Plaintiff needed range of motion/therapeutic exercise, speech/hearing therapy, occupational therapy, and rehabilitation therapy and that while Plaintiff was not receiving physical therapy at that time, he needed physical and occupational therapy for his right knee injury.  Id.  Lastly, Dr. Toosy noted that Plaintiff needed a cane, a hospital bed, diapers, dressings, respiratory aids, a bath bar, a bath seat, a grab bar, a shower handle, and an air conditioner and that a prescription for a cane had been given.  Id. 99.

On June 27, 2002, Plaintiff returned to the gastrointestinal clinic at St. Luke's-Roosevelt. Id. 88.  Plaintiff had missed his appointment for a sigmoidoscopy on June 24, 2002.  Id.  He did not want to take enemas "because they are generic," and he wanted to be evaluated elsewhere. Id.  He refused to be examined at that time.  Id.  The doctor noted that Plaintiff most likely suffered from hemorrhoids.  Id.

4

On January 15, 2003, Plaintiff voluntarily admitted himself to North General Hospital for detoxification from alcohol and drug use; he was discharged on February 12, 2003.  Id. 135-48. Upon admission, Plaintiff reported daily use of alcohol and marijuana.  Id. 135.  Plaintiff was also diagnosed with cocaine abuse.  Id. 138.  A biopsychosocial assessment of Plaintiff completed on February 8, 2003, stated that Plaintiff appeared alert and responsive to questioning. Id. 144.  It also noted that Plaintiff may be apathetic about aftercare treatment, id., although a discharge note stated that Plaintiff was fairly motivated about aftercare.  Id. 139.  A mental status examination indicated that Plaintiff had a neat and age-appropriate appearance, was ambulatory, and was friendly and cooperative as well as guarded towards the examiner.  Id. 145.  His speech was of normal tone, and his mood was engaging and euphoric as well as apathetic.  Id.  Plaintiff's thought processes were coherent and logical, and he did not suffer from hallucinations, illusions, or depersonalization.  Id.  Upon discharge, Plaintiff was in stable condition, and his mental status was normal.  Id. 138-39.  He had achieved his treatment goals, he was cooperative, and he appeared to be motivated for recovery.  Id. 148.  He was prescribed a number of medications, including Zyprexa, and he was referred to the Realization Outpatient Program.  Id. 139-40, 148.

On March 18, 2003, Plaintiff went to the Emergency Department at North General Hospital in order to get a refill of Zyprexa.  Id. 131-34.  He reported no complaints.  Id. 131. Plaintiff was diagnosed as having depression with psychotic symptoms, rule out bipolar disorder. Id.  Plaintiff returned to the Emergency Department at North General Hospital on September 9, 2003, at which time he was diagnosed as having pharyngitis and an upper respiratory infection. Id. 128-30.  Almost a week later, on September 15, 2003, Plaintiff again went to the Emergency Department at North General Hospital in order to get a refill of Zyprexa.  Id. 126-27.  He said

that he was prescribed the medication by a doctor at Sloan Kettering, and he denied a history of substance abuse.  Id. 127.  At the time, Plaintiff appeared guarded and somewhat suspicious, stating that he had been without Zyprexa for two days, during which time he had not slept.  Id. He denied manic or psychotic symptoms.  Id.  He was alert and oriented to person, place, and time.  Id.  Plaintiff was diagnosed with a mood and psychotic disorder not otherwise specified, and he was again prescribed Zyprexa.  Id. 121, 125.  Plaintiff was scheduled for an appointment at the Mental Health Clinic at North General Hospital on October 6, 2003.[1]  Id. 121.

On September 18, 2003, Plaintiff was seen by a doctor at the Hospital for Special Surgery for injuries to his right hand and right clavicle, but the report lacks any findings.  Id. 120. Plaintiff was given a prescription for Bextra.  Id. 117, 163-64.

Two days after the hearing, on September 24, 2003, the ALJ subpoenaed treatment records for Plaintiff from North General Hospital, the Hospital for Special Surgery, and Memorial Sloan Kettering.  Id. 78, 180-81.  The only treatment records received by the ALJ were from North General Hospital and, as noted in the ALJ's decision, "[t]hose records were entered into the record as Exhibit 12F and proffered to the claimant (Exhibit 8E)."  Id. 16.

### 2.    Records from Consultative Examinations

Before applying for SSI, Plaintiff was examined by internist, Dr. S. Menon, on February 28, 2002.  Id. 80-82.  Upon examination, Dr. Menon noted that Plaintiff was in no acute distress and was comfortable during the exam.  Id. 81.  Plaintiff's behavior and affect appeared to be normal.  Id.  Dr. Menon reported a deformity of the right clavicle due to a fracture.  Id.  He also reported that Plaintiff's right thumb was stiff, and he was unable to make a fist with his right

---

[1]There is no evidence that this appointment took place.

hand.  Id.  Dr. Menon reported that Plaintiff was able to walk with the help of a cane, but his

station and gait were normal.  Id.  He noted that Plaintiff had some trouble getting up from a

seated position and getting on and off of the examination table.  Id.  The range of motion of

Plaintiff's right shoulder was mildly restricted in all planes, but all of his other joints had a full

range of motion without any deformity, swelling, or tenderness.  Id.  There was a mild restriction

in Plaintiff's range of motion in his spine due to pain.  Id.  Straight leg raising was 15 degrees on

the right side and 60 degrees on the left side.  Id.  Plaintiff was not able to heel walk, toe walk,

tandem walk, or squat.  Id.

Dr. Menon diagnosed Plaintiff with a history of fracture of the right clavicle that was

mildly impaired and stable; right shoulder pain that was mildly impaired and stable; a history of

injury to the right hand that was mildly impaired and stable; a history of rectal bleeding, the

cause of which was to be investigated; and mild anemia.  Id.  With respect to Plaintiff's ability to

perform work-related activities, Dr. Menon opined that Plaintiff was able to sit, stand, hear, and

speak.  Id.  He found that Plaintiff was moderately impaired in walking, lifting, carrying,

handling objects, and traveling, secondary to the pain in his back and right leg.  Id. 81-82.  Dr.

Menon referred Plaintiff for an orthopedic evaluation.  Id. 82.

Plaintiff saw Dr. M. Tsinis on March 7, 2002, for an orthopedic evaluation.  Id. 83-85.

Upon physical examination, Dr. Tsinis found that Plaintiff had a mild limitation in the range of

motion of his cervical spine, but the ranges of motion in his elbow and wrist joints were normal.

Id. 84.  The left shoulder was entirely normal, but there was pain on motion and tenderness on

palpation of the right shoulder, although no swelling or redness.  Id.  There was a deformity of

the right clavicle.  Id.  While the fingers on Plaintiff's left hand were entirely normal, Plaintiff

was guarding any right thumb movement and was not compliant with the examination.  Id.

Plaintiff had full passive range of motion of his right thumb and could make a full fist with his

right hand.  Id.  Plaintiff had no spasms or muscle atrophy in his upper extremities.  Id.  Muscle

power was normal except for his right hand grip, which was 4/5, and his right thumb opposition

was mildly limited.  Id.  Dr. Tsinis reported that Plaintiff walked with a normal gait.  Id.  He used

a cane but could walk unassisted.  Id.  Plaintiff could not get up on his toes and heels, but he

could get up from the chair and from the examination table to a sitting position without any

difficulty.  Id.  Dr. Tsinis observed Plaintiff bend forward to 60 degrees.  Id.  Dr. Tsinis reported

normal ranges of motion for Plaintiff's hip, knee, and ankle joints, as well as for Plaintiff's toes.

Id. 85.  Plaintiff had no spasms or muscle atrophy of his lower extremities, all muscle power was

normal, and he had excellent coordination and control of both lower extremities.  Id.

Dr. Tsinis diagnosed Plaintiff with status post right clavicle fracture, right shoulder

adhesive capsulitis, myofacial neck pain, lumbosacral spine derangement, and status post right

thumb injury with mild impairment.  Id.  With respect to Plaintiff's ability to perform work-

related activities, Dr. Tsinis opined that Plaintiff's abilities in lifting, carrying, pushing, pulling,

prolonged standing, and walking were moderately impaired due to his right shoulder and low

back pain.  Id.  She opined that fine manipulation of his right hand was also mildly impaired, but

fine manipulation of his left hand was preserved.  Id.  Dr. Tsinis concluded that Plaintiff was able

to perform light sedentary activities.  Id.

Another orthopedic evaluation was conducted on June 12, 2002, by Dr. Kyung Seo.  Id.

100-01.  Dr. Seo noted that Plaintiff walked into the examination room with a cane on the left-

hand side, but the cane was non-weight-bearing.  Id. 100.  Plaintiff had no problem standing up

from a sitting position or getting on and off of the examination table.  Id.  The fine motor activity in both of Plaintiff's hands was normal.  Id.  Dr. Seo reported normal cervical lordosis in Plaintiff's cervical spine, and no spasm of the paraspinal muscles.  Id.  Palpation of the right clavicle showed a defect, and there was greater flexion of the left shoulder compared to the right shoulder.  Id.  Dr. Seo noted no sensory defect nor muscular atrophy of the arms.  Id.  He noted a superficial laceration wound on Plaintiff's right thumb.  Id.  The gripping strength in both hands was 5/5.  Id.  Dr. Seo reported normal lumbar lordosis of the lumbosacral spine and mild spasm of the paraspinal muscle of the low back.  Id. 101.  There was no muscle atrophy of the thigh or lower leg.  Id.  Plaintiff could walk toe-to-toe, heel-to-heel, and toe-to-heel.  Id.  He could squat halfway down, complaining of back pain.  Id.  Dr. Seo reported muscle strength in both legs was 5/5.  Id.  Dr. Seo's impression was status post laceration at the level of right metacarpophalangeal joint of the thumb superficially and chronic muscle strain of the paraspinal muscle of the low back.  Id.  Dr. Seo opined that due to aching pain in his back with mild spasm, Plaintiff's abilities to sit, stand, bend, lift, and carry heavy objects were slightly limited.  Id.

Dr. Richard King conducted a psychiatric evaluation of Plaintiff on June 21, 2002.  Id. 102-03.  He reported that Plaintiff was well-groomed and had good personal hygiene.  Id. 102. Upon examination, Dr. King noted that Plaintiff established a good rapport, was in no acute distress, and was cooperative.  Id.  Plaintiff's speech was coherent and relevant with no thought disorder, and Dr. King noted that Plaintiff's affect was fairly well-modulated, friendly, and appropriate.  Id.  Plaintiff's mood was euthymic, and he was not significantly depressed or anxious.  Id.  Plaintiff did not exhibit any hallucinations, delusions, suicidal ideations, ideas of reference, or paranoid trends.  Id.  Dr. King noted that Plaintiff's intellectual functioning was

average.  Id.  His insight and judgment were fair, and his attention, concentration, and fund of

information were all adequate.  Id.  Plaintiff's memory was grossly intact; his sensorium was

clear; and he was oriented to person, place, and time.  Id.  Dr. King noted that Plaintiff was able

to perform routine activities of daily living and household chores, including shopping.  Id.

Dr. King diagnosed Plaintiff with adjustment disorder of adult life, with anxiety and

depression to a mild degree.  Id. 103.  He opined that Plaintiff had a satisfactory ability to

understand, carry out, and remember instructions, as well as a satisfactory ability to respond

appropriately to supervision, co-workers, and work pressures in a work setting.  Id. 102.  Dr.

King further opined that Plaintiff was able to manage his own funds.  Id. 103.

### 3.      Findings of State Agency Non-Examining Consultant

On July 29, 2002, Dr. Richard Finley reviewed the medical evidence of record and

discounted the "Medical Request for Home Care" form signed by Dr. Toosy insofar as it

indicated a need for a cane or diapers.  Id. 104.  Dr. Finley opined that these requests might relate

to very temporary needs on Plaintiff's part.  Id.  He concluded that Plaintiff could lift/carry 20

pounds occasionally, 10 pounds frequently, could stand/walk 6 hours in a workday, and perform

the other functions of light work.  Id.  Dr. Finley did not find evidence to support a finding of

functional limitations based on Plaintiff's right thumb injury, but he could not assess Plaintiff's

right shoulder or clavicle without X-rays.  Id.

X-rays were thereafter taken of Plaintiff's right clavicle and shoulder on August 7, 2002.

Id. 105.  The X-ray of Plaintiff's right clavicle showed an old, un-united fracture of the mid-

portion of the clavicle, but the X-ray of the right shoulder was negative.  Id.

On September 6, 2002, after reviewing the X-rays, Dr. Finley opined that the non-union

clavicle placed mild limitations on Plaintiff's right arm with respect to heavy lifting and reaching above shoulder-level.  Id. 106.  Nonetheless, Dr. Finley still believed that Plaintiff could lift/carry 20 pounds occasionally, 10 pounds frequently, could stand/walk 6 hours in a workday, and perform most of the manipulative functions of light work.  Id.  Dr. Finley opined that Plaintiff could perform many unskilled light-work jobs and the full range of unskilled sedentary jobs despite his musculoskeletal impairments.  Id.

### 4.    Additional Medical Evidence

In response to the original Report and Recommendation, Plaintiff submitted additional medical records.  See Defendant's Reply Memorandum (Docket # 19) Ex. A.  The earliest of these records is dated November 11, 2005, and is a letter from Dr. S. Ramachandran Nair.  Dr. Nair reports that his initial visit with Plaintiff took place on June 15, 2004, to deal with complaints of rectal pain and bleeding.  Id.  Plaintiff's condition was essentially the same as before, with a nonunion right clavicle and pain to his right hand and right knee.  Id.  The November 11, 2005, letter also diagnoses Plaintiff with anxiety-panic disorder.  Id.

In a subsequent letter from Dr. Nair dated May 21, 2008, he diagnosed Plaintiff with a frozen right shoulder, a painful mal-united fracture of the right clavicle, lumbago, osteoarthritis of the right knee, post-traumatic wasting of the right hand, recurrent rectal bleeding, a colonic polyp with atypia which was under observation, a healing left facial abscess, and bipolar disorder.  Id.  Dr. Nair concludes, "In view of these and the psychiatric problems, the patient appears to be totally disabled for any kind of work at this time."  Id.

There are additional medical reports from Dr. Nair dated April 25, 2007, April 25, 2008 (which appears to be a duplicate of the first two pages of the report from April 25, 2007), and

July 23, 2008, as well as a Disability Interview form (presumably completed by Dr. Nair) dated August 13, 2008.  Id.  These reports are essentially the same as the May 21, 2008, letter in terms of their findings, with the form from August 13, 2008, noting that the right shoulder range of motion was "markedly reduced," the lumbar spine range of motion was "painfully limited" with paraspinal muscle spasms, and the right hand opposition of the thumb to the other fingers and grip strength were reduced.  Id.

### C.    Other Evidence

At the time of the hearing, Plaintiff was 39 years old.  Id. 156.  He had a 12th grade education.  Id. 157.  Plaintiff testified that he had not worked in the last 15 years.  Id. 158.  He claimed that he was disabled due to a nonunion clavicle on the right side, a right hand laceration, and a right leg injury caused by a knife wound suffered in 1995, as well as depression and anxiety.  Id. 158-59.  He testified that he took Paxil and Zyprexa for his mental disorders, id. 159, that his clavicle had been broken since 1995, id. 160, and that his right hand was lacerated in 1996.  Id. 161.  Plaintiff testified that he was being treated at Sloan Kettering Hospital for rectal bleeding which had not resolved.  Id. 164.  He said that while he was not diagnosed with cancer, the doctors did not know what was causing the bleeding, although at one time they said it was hemorrhoids.  Id. 165.

Plaintiff testified that due to his nonunion clavicle, he could not lift things and was in pain most of the time.  Id.  He had been on several medications but that they had not been helpful.  Id.  Plaintiff said that he had been receiving psychiatric treatment at North General Hospital since July, 2003, and that he had been treated for his mental impairment at Sloan Kettering from April, 2002, to July, 2003.  Id. 166.  Plaintiff testified that Sloan Kettering had

prescribed him Paxil and Zyprexa for his psychiatric illness.  Id. 168.

Plaintiff said that as a result of his leg injury due to a knife wound, he could walk two or three blocks, and he walked with a cane.  Id. 170.  He had his cane with him at the hearing.  Id. Plaintiff said he was prescribed the cane two years earlier when he was at St. Luke's Hospital.  Id. 171.  He also testified to a problem with standing because one leg is longer than the other.  Id. Plaintiff testified that he could stand for 10 or 20 minutes without having to sit down and that while he had no problem sitting, he had a problem getting up from a sitting position.  Id. 171-72. Plaintiff said that although he was right-handed, he used his left hand to do a lot of things because his right hand hurt from the laceration.  Id. 172.  He said he could not and did not lift anything.  Id.

Plaintiff said he spent his days going to doctors appointments.  Id. 172-73.  He said he had nine medical appointments per month.  Id. 173.  He said he did not drink, smoke, or use illegal drugs.  Id. 175.  He said he fed and dressed himself and cared for his own personal hygiene.  Id.

A vocational expert testified at the hearing.  The ALJ asked the vocational expert to assume that he was considering a person who was the same as Plaintiff – 39 years old, with a high school education, and no prior relevant work, who could perform work up to the light level, but with no lifting of the right arm above shoulder-level.  Id. 177.  The ALJ asked whether there were jobs that such a person could perform.  Id.  The vocational expert testified that such a person could work as an assembler of small parts, which had Dictionary of Occupational Titles

("DOT") code 739.687-030, was unskilled, exertionally light, and had an SVP[2] of 2.  Id. 177-78.

He testified that there were 1,439 such jobs in the New York City area and 163,039 such jobs

nationally.  Id. 178.  The vocational expert also testified that such a person could work as a

messenger, DOT code 230.663-010, which was unskilled, exertionally light, and had an SVP of

2, with 7,953 such jobs in the New York City area and 120,178 such jobs nationally.  Id.  Finally,

the vocational expert testified that such a person could work as a cafeteria attendant, DOT code

311.677-010, which was unskilled, exertionally light, and had an SVP of 2, with 1,534 such jobs

in the New York City area and 106,566 such jobs nationally.  Id.

      The vocational expert further testified that if the work should not involve face-to-face

contact with the general public, then such person could not perform the messenger job, but could

still perform the other two jobs.  Id.  If the work that this person could do had to be simple, not

detailed, then the person could still do all of the jobs cited by the vocational expert.  Id.

## II.    APPLICABLE LEGAL PRINCIPLES

### A.    Standard of Review

      The scope of review in an appeal from a social security disability determination involves

two levels of inquiry.  First, the court must review the Commissioner's decision to determine

whether the Commissioner applied the correct legal standard when determining that the plaintiff

was not disabled.  Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999).  Failure to apply the correct

legal standard is grounds for reversal of the ruling.  Townley v. Heckler, 748 F.2d 109, 112 (2d

---

[2]"SVP" stands for "specific vocational preparation," which is defined as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Dictionary of Occupational Titles, Appendix C.  An SVP of 2 means "[a]nything beyond short demonstration up to and including 1 month."  Id.

Cir. 1984).  Second, the court must decide whether the Commissioner's decision was supported

by substantial evidence.  Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003).

"Substantial evidence means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  Id. at 106 (internal quotation marks and citations omitted).

When determining whether substantial evidence supports the Commissioner's decision, it is

important that the court "carefully consider[] the whole record, examining evidence from both

sides."  Tejada, 167 F.3d at 774 (citing Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997)).  "It

is not the function of a reviewing court to decide de novo whether a claimant was disabled."

Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (citation omitted).  If the "decision rests on

adequate findings supported by evidence having rational probative force, [the court] will not

substitute [its own] judgment for that of the Commissioner."  Veino v. Barnhart, 312 F.3d 578,

586 (2d Cir. 2002).  Moreover, the ALJ "has an obligation to develop the record in light of the

non-adversarial nature of the benefits proceedings, regardless of whether the claimant is

represented by counsel."  Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citations omitted).

## B.   Determining Disability

In the context of SSI, the Act defines "disability" as the inability "to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(A).  In

evaluating a disability claim, regulations issued pursuant to the Act set forth a five-step process

that the Commissioner must follow.  See 20 C.F.R. § 416.920(a)(4).

First, the Commissioner will consider whether the claimant is working in "substantial

gainful activity." Id. at § 416.920(a)(4)(i),(b).  If the claimant is engaged in "substantial gainful activity," then the Commissioner will find that the claimant is not disabled.  Id.  Second, the Commissioner considers the medical severity of the claimant's impairments.  Id. at § 416.920(a)(4)(ii).  The claimant's impairment will not be deemed severe "[i]f [he or she] do[es] not have any impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic work activities."  Id. at § 416.920(c).  Third, if it is found that the claimant's impairments are severe, the Commissioner will determine if the claimant has an impairment that meets or equals one of the impairments presumed severe enough to render one disabled, listed in Appendix 1 to Part 404, Subpart P of the Social Security Regulations.  See id. at § 416.920(a)(4)(iii),(d).  If the claimant's impairments are not on the list, the Commissioner considers all the relevant medical and other evidence and decides the claimant's residual functional capacity.  See id. at § 416.920(e).  Then, the Commissioner proceeds to the fourth step to determine whether the claimant can do his or her past relevant work.  See id. at § 416.920(a)(4)(iv),(e)-(f).  Finally, if it is found that the claimant cannot do his or her past relevant work, the Commissioner will consider the claimant's residual functional capacity, age, education, and work experience to see if he or she can make an adjustment to other work.  See id. at § 416.920(a)(4)(v),(g).

The claimant bears the burden of proof on the first four steps of this analysis.  DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998) (citation omitted).  If the ALJ concludes at an early step of the analysis that the claimant is not disabled, he or she need not proceed with the remaining steps.  Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 2000).  If the fifth step is necessary, the burden shifts to the Commissioner to show that the claimant is capable of other work.

16

DeChirico, 134 F.3d at 1180 (citation omitted).

### III.   **DISCUSSION**

As required, in deciding Plaintiff's case, the ALJ correctly applied the five-step sequential analysis set forth in the regulations.  First, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since his alleged onset date.  AR 14.  Second, she found that Plaintiff did not suffer from a severe psychiatric impairment, id. 15, nor did he suffer severe impairments of his back, right hand, or right leg or a severe impairment resulting from rectal bleeding.  Id. 16. However, the ALJ found that Plaintiff had a right upper extremity impairment resulting from a right clavicle fracture that was "severe" within the meaning of the Social Security Regulations, but not severe enough to meet or equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  Id.  Therefore, she went on to determine Plaintiff's residual functional capacity and found that Plaintiff had a residual functional capacity "for light work with no lifting of the right arm above the shoulder level."  Id. 17.  Based on this assessment of Plaintiff's residual functional capacity, the ALJ had to determine whether Plaintiff could perform any of his past relevant work.  However, she found that Plaintiff had no past relevant work.  Id. 18.  Thus, the burden shifted to the Commissioner "to show that there are other jobs existing in significant numbers in the national economy that [Plaintiff] can perform, consistent with his residual functional capacity, age, education and work experience."  Id.

The ALJ noted that Plaintiff's age, education, and vocationally relevant past work experience had to be looked at in conjunction with the Medical-Vocational Guidelines of Appendix 2 of Subpart P of the Regulations.  Id.  She stated that since Plaintiff was 39 years old at that time, he was a "younger individual" as defined in 20 C.F.R. § 416.963.  Id.  Plaintiff had a

high school education and no transferable skills since his past relevant work had not been performed during the relevant period.  Id.  The ALJ explained that the "Medical-Vocational Guidelines are used as a framework for the decision when the claimant cannot perform all of the exertional demands of work at a given level of exertion and/or has any nonexertional limitations."  Id.  She found that based upon Plaintiff's residual functional capacity, he was able to perform a significant range of light work as defined in 20 C.F.R. § 416.967.  Id.  The ALJ noted that if Plaintiff were capable of performing the full range of light work, then the Medical-Vocational Guidelines would direct a finding of "not disabled."  Id.  However, because Plaintiff's ability to perform all or substantially all of the requirements of light work was impaired by additional exertional and/or nonexertional limitations, a vocational expert was used to help determine whether there were a significant number of jobs in the national economy that Plaintiff could perform.  Id.

The ALJ questioned the vocational expert at the hearing as to whether there were jobs in the national economy for someone of Plaintiff's age, education, lack of past relevant work experience, and residual functional capacity.  The vocational expert testified that Plaintiff could perform unskilled work as an assembler of small parts, a messenger, and a cafeteria attendant. Id. 19.  The ALJ concluded that based on the vocational expert's testimony, "considering [Plaintiff's] age, educational background, lack of work experience, and residual functional capacity, he is capable of making a successful adjustment to work that exists in significant numbers in the national economy.  A finding of 'not disabled' is therefore reached within the framework of Medical-Vocational Rule 202.20."  Id.

The Commissioner claims that the ALJ's decision is supported by substantial evidence,

while Plaintiff claims that he was, and continues to be, disabled.

**A.    The ALJ's Decision is Supported by Substantial Evidence**

The ALJ noted that Plaintiff's claimed impairments were "a right clavicle fracture in 1995, a right hand injury in 1996, right leg injury in 1995, lower back injury, rectal bleeding and depression."  AR 14.

In ruling out a severe pyschiatric impairment, the ALJ pointed out that while Plaintiff was hospitalized one time, it was

> only for his substance dependence/abuse.  He was not treated for a psychiatric disorder until he was evaluated in September 2003.  On that occasion, the notes do not indicate that his mood and psychotic disorder NOS were severe.  When examined by a consultant in June 2002 his symptoms were only mild.  The evidence does not establish that [Plaintiff] has had a severe psychiatric disorder for at least twelve consecutive months.

Id. 15.  As pointed out by the ALJ, and as demonstrated by a review of the record, there is no evidence from Plaintiff's treating sources to support a finding of severe psychiatric impairment, see, e.g., id. 139 (mental status upon discharge from detoxification program was normal), 127 (when examined on September 15, 2003, Plaintiff was alert and oriented to person, place, and time, his affect was euthymic, and he denied manic or psychotic symptoms), and this finding is further supported by the medical report from the psychiatric consultative examiner.  See id. 102 (concluding that Plaintiff "has a satisfactory ability to understand, carry out and remember instructions, and a satisfactory ability to respond appropriately to supervision, co-workers and work pressures in a work setting").

The ALJ also reviewed the evidence of record and determined that there was "no objective evidence to establish a severe back impairment," noting in particular that Plaintiff had not testified about a back impairment at the hearing.  Id. 16.  The ALJ likewise concluded that there was "no objective evidence to establish a severe right leg impairment or right hand laceration resulting in his inability to use his right hand."  Id.  Lastly, the ALJ determined that Plaintiff did not suffer a severe impairment resulting from rectal bleeding "for which [Plaintiff] testified he was treated at Sloan Kettering, although he did not have cancer."  Id.  The ALJ stated that she "attempted to assist [Plaintiff], in spite of his uncooperative attitude at the hearing, by issuing subpoenas for treatment records (Exhibits 6E and 7E), but the only response was from North General Hospital."  Id.

The ALJ explained that her finding regarding residual functional capacity was consistent with the State agency expert opinion and with the examination consultant's opinion.  Id. 17.  In particular, she noted that while Plaintiff brought a cane to the consultative examination, it was "non-weight-bearing."  Id.  The ALJ also pointed out that the State agency doctor found that Plaintiff's back pain, which was treated with non-steroidal anti-inflammatory medications, was "readily compatible with lifting/carrying 20 pounds occasionally and 10 pounds frequently; standing/walking 6 hours/workday and performing the other functions of light work."  Id.  She found that there was "no evidence inconsistent with this residual functional capacity."  Id. Indeed, there are no records from Plaintiff's treating sources during the relevant time period[3] to indicate that he suffered any physical limitation beyond that found by the ALJ as result of his

---

[3]Plaintiff has provided more recent medical records from a treating physician which are addressed in Section III.B., infra.

history of chronic pain from injuries to his right collar bone, right leg, and right hand.

In determining Plaintiff's residual functional capacity, the ALJ found that his allegations concerning his impairments were not credible.  Id.  For example, she noted that Plaintiff "had denied at various times that he has a history of substance abuse and alcohol dependence, despite the record showing to the contrary."  Id.; compare id. 102 ("The claimant denies any significant substance dependence.  The claimant denies any alcohol dependence.") with id. 135-48 (hospital records concerning treatment for substance abuse during January and February, 2003)  The ALJ also indicated that Plaintiff "was very uncooperative and had a bad attitude at the hearing."  Id. 17.  She found that this attitude "was consistent with the note dated June 3, 2002 (Exhibit 3F) when he came to the clinic to get forms from his chart and refused to answer when questioned whether he still had rectal bleeding, stating, 'it is a waste of time' 'man let people upstairs to deal with the bleeding!'  He left because he did not find the form he was looking for in his chart."  Id.

The ALJ also found that Plaintiff's testimony as to his functional limitations – e.g., that his walking was limited to two to three blocks with a cane because of a right leg injury; that his standing was limited to ten to twenty minutes at a time because one leg is longer than the other; that he was unable to use his right hand because of pain; and that his lifting was limited to five pounds – was not credible in light of the medical record and the entire record as a whole.  Id. She pointed out that Plaintiff testified to using his left hand to do what he used to do with his right hand.  Id.

An ALJ's credibility findings are entitled to deference by a reviewing court.  See Tejada, 167 F.3d at 775-76 (upholding ALJ's credibility determination, citing with approval Pascariello v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985), in which the district court noted "that after

weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility, the ALJ, in resolving conflicting evidence, may decide to discredit the claimant's subjective estimation of the degree of impairment."); see also Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) ("It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant.  If the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain.") (internal quotation marks and citation omitted).  As set forth above, in rendering her decision in this case, the ALJ carefully considered all of Plaintiff's subjective complaints concerning his physical limitations and gave detailed reasons why she believed they were not entitled to great weight, and such findings are supported by substantial evidence in the record.  See AR 14-17 (including citations to record evidence).  Consequently, there is no basis to disturb these findings.

Finally, given the ALJ's finding that Plaintiff's residual functional capacity rendered him capable of performing a significant range, as opposed to the full range, of light work because of "additional exertional and/or non-exertional limitations," id. 18, she properly chose to elicit the testimony of a vocational expert on the issue of whether there was a significant number of jobs in the national economy that Plaintiff could perform.  See Bapp v. Bowen, 802 F.2d 601, 605-06 (2d Cir. 1986).  Because the ALJ's determination with regard to Plaintiff's residual functional capacity is supported by substantial evidence, as explained, supra, and because the hypothetical questions posed to the vocational expert incorporated that determination, the ALJ properly relied upon the vocational expert's testimony to support her decision that Plaintiff was not disabled. See Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983).

Based on the foregoing, I conclude, and respectfully recommend that Your Honor should conclude, that the ALJ's decision that Plaintiff was not disabled is supported by substantial evidence.

**B.      Plaintiff's New Evidence Does Not Warrant A Remand**

In opposition to the Commissioner's motion, Plaintiff has submitted additional medical evidence.  See Defendant's Reply Memorandum Ex. A.  A court may order a remand to the Commissioner to allow for the consideration of additional evidence that was not part of the original administrative record.  42 U.S.C. § 405(g) ("The court may . . . order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.").  The party seeking remand must satisfy a three-part test:

> that the proffered evidence is (1) new and not merely cumulative of what is already in the record, and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative.  The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the Secretary to decide claimant's application differently.  Finally, claimant must show (3) good cause for her failure to present the evidence earlier.

Lisa v. Sec'y of Dep't of Health & Human Servs., 940 F.2d 40, 43 (2d Cir. 1991) (internal quotation marks and citations omitted).

The new evidence provided by Plaintiff consists of two letters and four medical reports, all from a Dr. S. Ramachandran Nair.  While one of the letters is dated November 11, 2005, the remaining documents are from 2007 and 2008.  Given that they all address Plaintiff's medical condition at the time that they were written, these documents are not "material" in that they are

not relevant to Plaintiff's condition during the time period for which benefits were denied, i.e., up through the issuance of the ALJ's decision on January 20, 2004.  The November 11, 2005, letter notes that Dr. Nair originally saw Plaintiff on June 15, 2004, "for rectal pain following upon colonoscopy, with polypectomy with atypia.  He also complained of rectal bleeding."  However, that initial appointment was itself five months after the relevant time period and in any event, does not contain any evidence that is "new" as opposed to merely cumulative.  Indeed, Dr. Nair's letter from May 21, 2008, notes Plaintiff's injuries "going back to 1990 resulting in pain in the R shoulder and the R clavicle, R hand, R knee and low back pain," all of which were addressed in the medical reports already in the administrative record.  AR 80-85, 87-95, 100-01.  Thus, to the extent that Dr. Nair provides any evidence that is relevant to the time period in question, such evidence is merely cumulative of the evidence already in the administrative record.  Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that the new evidence submitted by Plaintiff does not warrant a remand of the case to the Commissioner.

## CONCLUSION

For the foregoing reasons I conclude, and respectfully recommend that Your Honor should conclude, that Defendant's motion for judgment on the pleadings (Docket #'s 11-12) should be granted, and the action should be dismissed.

## NOTICE

_____Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(d), or a total of seventeen (17) working days, see Fed. R. Civ. P. 6(a), from the date hereof, to file written objections to this Report and Recommendation.  Such objections, if any, shall be filed

with the Clerk of the Court with extra copies delivered to the chambers of The Honorable

Kenneth M. Karas at the United States Courthouse, 300 Quarropas Street, White Plains, New

York, 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later

appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Karas.

Dated: April 8, 2010
        White Plains, New York

Respectfully submitted,

Lisa Margaret Smith
United States Magistrate Judge
Southern District of New York


A copy of the foregoing Report and Recommendation has been sent to the following:

The Honorable Kenneth M. Karas, U.S.D.J.

Joseph Mark Harris-Batten
196 Bradhurst Avenue, Apt. 8
New York, NY 10039-1412

Susan Branagan, Esq.
United States Attorney's Office
Southern District of New York
86 Chambers Street, 3rd Floor
New York, NY 10007